The Honorable, the Judges of the United States Court of Appeals. Oyez, oyez, all persons having in mind a form of business before the United States Court of Appeals are admonished to draw a nat and get their attention, for the Court is now sitting. God save the United States and this Honorable Court. Be seated. Thank you. On behalf of Judge Mary Ann Barry, Judge Cheryl Krause, and myself, it is a privilege for us to be substituting for our colleagues on the Fourth Circuit in this case. Judge Barry, can you hear me? Yes, I can, Judge Ambrose. Good morning to my dear colleagues. Great. Good morning. We have one case today, and it's DeMasters v. Carilion Clinic, number 13-2278. Mr. Grimes? Yes, Your Honor. And Ms. Starr? And Mr. Friedman? Whenever you're ready. Yes, Your Honor. May it please the Court, good morning. My name is Terry Grimes, and I represent Neal DeMasters in this appeal. With me today is Brittany Haddox and Susan Starr from the EEOC. We have ceded five minutes of argument time to the EEOC. In this appeal, the employer perceived that Neal DeMasters What were the exact activities of Mr. DeMasters at the hospital? What was his job description? What was his job? He was an EAP counselor, an employee assistance counselor. And what does that mean? He counseled employees on their various problems, whatever they may be, work problems, personal problems, drug and alcohol, whatever it may be. And this particular, when Doe approached him and said that his manager had acted inappropriately, DeMasters was the person, a typical person that you would normally go to for that type of, to register that type of concern, complaint? No, I don't think that's the case at all. Anybody having some sort of emotional difficulty, as I've said, whatever it may be, family, work, drugs, alcohol, would be referred to an EAP counselor. The record does not tell us exactly what Mr. DeMasters duties were, but that's a reasonable inference simply from his title. And this much I can say, Your Honor, he didn't work in HR. He didn't work in risk management. He was an EAP counselor. Yes, Your Honor. Where one of the issues that we are dealing with is the potential application of a manager rule. Yes. And the burden is on you as to the pleading of elements here. Where there is no description of what those job responsibilities entailed, how are we to evaluate the application of the manager rule? Well, the answer is that you can't apply the manager rule here for several reasons. Of course, the district court below relied heavily on an unpublished decision from the 11th Circuit Brush v. Sears Holding Corporation. Of course, we're here arguing 4th Circuit law. First, there is no manager rule in the 4th Circuit under Title VII. Second, there's no manager rule in the statute. You've got a circuit split. You've got a manager rule or one could call it a manager exception in the 8th and the 11th Circuits, although the 11th Circuit is not precedential. You don't have it explicitly in the 6th Circuit, so you do have a bit of a circuit split so far as to whether you apply it. Right, a bit of a circuit split, Your Honor. And I think it's fair to say the case law on this particular point is not particularly well developed. That may be an understatement. But even if there were a manager rule here, it would not apply because in Brush, the plaintiff was tasked with conducting the investigation. That's a fact from Brush. Here, there's no allegation. Now, when I use the word evidence, we're, of course, not to the point of evidence, but there's no allegation that DeMasters was tasked with conducting any investigation. To rule otherwise would be inferring evidence in the light most favorable for Carillion, which is not what we're about here today. Well, what was he to do? Sit there like a potted plant or once he spoke to those people, persons who came to consult with him? Your Honor, you're not on the screen right here, but I can see you. That's too bad. Over there. I'm sorry. And I see you here to my left and my right. But would you ask your question again, please? What is your idea of what Mr. DeMasters was to do with the information that he was told when persons consulted with him? I didn't mean to cut you off. No, I mean, was he supposed to report it? Was he supposed to just advise without reporting? What do you think he was supposed to? What was he charged with doing? Absolutely nothing. Or are we not there yet? We're not there yet. That would require some measure of discovery to flesh out exactly what DeMasters was or was not to do. So what does he say? What does he say in the amended complaint, if anything, about what he was to do once he learned of conduct that was problematic, let's say? He had no obligation to do anything other than to tend to Mr. Doe's emotional needs. When he reported the matter to Carilion, had Doe sign a release, he stepped outside of his role as an EAP counselor and became, at least at some point, an advocate, if you will, for John Doe. But surely it's within, without any allegations in the complaint, we can draw a reasonable inference that someone in that consulting position to an employee could facilitate for the employee the further communications of that employee to the employer. And if we reject a manager role in this context, aren't we creating a problem that employees who work in that capacity in a kind of consulting or advising role or an HR type of role, then all of their work falls under protected activity, sort of pro se. I mean, you end up, as the Fifth Circuit described in Hagan, converting otherwise typical at-will employment relationships into litigation minefields. Why aren't we walking into that here? Well, I call your attention to Cisneros. This was a case we cite on brief, which is factually quite similar to the case here, Your Honor. And you're not opening, as it were, the floodgates of litigation. There, a supervisor was informed by one of his subordinates that she felt sexually harassed by another employee. Upon the employee's request, she arranged a meeting with HR. This happened three times. And on the third time, the employee was fired, the supervisor was fired. And there, the First Circuit held that a jury could reasonably view the supervisor's persistent efforts to initiate the sexual harassment complaint as resistant or antagonistic to the complaint of conduct. So to answer your question, you're almost doing away with the retaliation clause altogether. Because if you adopt the district court's view here, then it almost sets up an affirmative defense, if you will. That the company can plead that the supervisor or here the EAP counselor reported the harassment of the change to HR, and that's a defense. That's a defense. That completely does away with the anti-retaliation provisions of Title VII. And the overarching purpose, let's not lose sight of the forest for the trees. The overarching purpose is to encourage, not discourage, employees to report harassment and discrimination for a salutary purpose. That is so the court can deal with it. So, excuse me, that the company can deal with it. But what are the actual statements or actions that you are alleging? We're in opposition. We're in opposition, and presumably we're outside of his job responsibilities. Okay. They're detailed in the complaint. I'm going to summarize them three ways, and then I'll be happy to recount them point by point. First, he stepped outside of his role when he had John Doe sign a release. Listen, Doe said, I'm afraid Carilion is going to retaliate against me. He said that at least twice to DeMasters, and maybe that's why DeMasters did what he did. He stepped outside of his role and went forward to HR to complain about what's some fairly salacious sexual harassment allegations, which we don't need to go in here today. They're in the complaint, but they're salacious.  Listen, the way the system is supposed to work, you report harassment, the company does an investigation, and then it does something to stop it or impose adequate remedial measures. But is it your position that simply reporting of harassment, relaying it to the employer as an intermediary is sufficient for opposition? There's case law that says that is sufficient. There's also case law from the Third Circuit that's suggesting that it's not. Yes, yes, you're correct. There's some case law that says that's sufficient and some that says that it is not. That's absolutely true. It's our position. Now, what I find interesting is that you, in one sentence, your last sentence of your brief, your reply brief, you simply say, we are seeking to apply the law as written. We are not seeking to expand Title VII retaliation law in any regard. You know, period. So you haven't responded to Kerry in point two of 20 pages many ways in which you're seeking to expand Title VII retaliation law. And isn't that what you're doing with reference to Judge Krause's question? I think I've interrupted your answer to it. But when you talk about the various incidents you allege of conduct here that should be protected, there really isn't a lot. Is there that you can even allege? Yes, there is. It's just as the Second Circuit said in Sumner, opposition activity includes informal protests of discriminatory employment practices, including making complaints to management, protesting against discrimination in general, and expressing support of coworkers who have filed complaints with the employer. And, again, that's what I was telling you about the Collazo. And here, in our view, Neal DeMasters fell within the zone of interest described by the Supreme Court in Thompson. Yes, Your Honor. On October 17, Mr. DeMasters was approached by Doe with regard to what Doe said was happening that was particularly offensive. Yes. Six days later, on October 23, after DeMasters went and reported on the 17th, my understanding is that the manager of Doe was fired. Is that correct? That's what my opponent says. I haven't found that in the record. Okay. Shortly after the person was fired, what, after that time, was opposed by Mr. DeMasters? What unlawful activity, employment practice, was opposed by DeMasters? DeMasters' downfall or failure here may have been his persistence, Your Honor. He persisted. On October 23 and 24, 2008, for example, when Doe met with DeMasters and reported to him that the harasser is back at work on the property and the hostile environment was getting worse, then DeMasters went— Well, he went back in to pick up his belongings. Yeah. Went back, yes, went back to pick up his belongings, been permitted back on the property. So DeMasters goes again at least a second time to HR and says, listen, things are really bad to the point that I am willing to coach the supervisor, the director's department, to teach them how not to maintain a hostile work environment and continue to harass the employee. And at some point, DeMasters, again, going above and beyond the call of duty, which was his undoing, told Doe that HR was not handling the case properly. And in this regard, I call attention to a case from your own circuit, which I think is instructive here, and that is Moore v. City of Philadelphia, and that's cited in the briefs. How does Moore help you? Because there what this court said is that in a situation where an employee is fired because the employer thought that he was engaged in protected activity, even if he actually was not, presents a valid legal claim. And here's what the court said. It does not matter whether the factual basis for the employer's discriminatory animus was correct as long as the employer's specific intent was discriminatory. In those cases, in that case, the retaliation is actionable. But Moore also says if litigants claim to be retaliated against for having opposed discrimination, they must have stood in opposition to it, not just objectively reported its existence or attempted to serve as an intermediary. What your opponent's going to say is Mr. DeMasters was a, quote, courier, close quote. Right. He reported it, and he may have served as an intermediary, but if you follow Moore, that's not enough. But that's not the case. He was not the mailman. He was not merely the letter carrier. Well, he really was, wasn't he? Because he really didn't go in shouting. You've used some poetic license to describe the actual conduct and using words like he persisted, he demanded. I don't see any of that in the amended complaint. Isn't the language, as Judge Ferry is pointing out, in the amended complaint, at least after the termination of the harasser, the communication to bear is simply that Carillion was not handling the case properly. From that, you're asking us to deduce, one, that there was a specific objection to the way the investigation was being handled, and number two, that there is a hostile work environment, which is a term of art under Title VII, with no facts that are pleaded in the complaint that support the existence of either an ongoing hostile work environment that that harasser was part of, or some new retaliatory hostile work environment. Are we just to divine that from the statements that the case was not being handled properly? No. Doe kept coming back to DeMasters and saying, I'm continuing to have problems to the point I'm becoming symptomatic. Things are not getting better. What problems did Doe identify? Doe identified they weren't being the harasser's friends, this is after the termination, after the firing of the manager. The harasser's friends were not being nice to him. He felt insulted. He felt frustrated. But that's about it, isn't it? Your Honor, he was symptomatic, but that is not the way the system is supposed to work. Attack the harasser. Fire the person who reports the harassment to the company. That is completely inconsistent with the anti-retaliation provisions of Title VII. And again, I tell you that this didn't end for DeMasters even after Doe's employment ended. On December 14, 2010, a manager from Carilion called DeMasters and said, Doe has filed a complaint with the EEOC and intends to file suit against Carilion for sexual harassment. And the manager said, this is not the end of us. You'll hear from Carilion. So we focus on Carilion's perception, Carilion's discriminatory animus and what it did to DeMasters, which is to fire him eventually, to throw him under the bus, as it were, for what he did. And it may be that what DeMasters did took place in a relatively short period of time, but that gets to the temporal aspect and causation under the retaliation element, the third element of retaliation. Well, maybe you and also your colleagues, when they address us, could help us tease out the law a little bit. Because isn't there some tension between the requirement that there be purposive actions to constitute opposition for that claim of retaliation, on the one hand, and the talisman of a Title VII suit, that is, looking to the employer's discriminatory intent? In a sense, you're arguing to us about the employer's intent and trying to focus less on the actual conduct or opposition. Your adversary is doing the opposite. But don't we have a bit of a quandary in a description of the claims here in the case law that sets up different and somewhat conflicting tests? Well, I don't know whether the tests are conflicting, Your Honor, or not. I will agree that the law in this particular area, both at the district court level and circuit court level across the country, which we've looked at in this case, is not always clear. And it is not always consistent. It is not always clear with the distinction between, for example, oppositional conduct and participatory conduct and so forth. But I'm not certain that informs the question here. In Crawford, what the Supreme Court said is we call it opposition if an employee took a stand against an employer's discriminatory practices. And that's exactly what DeMasters did here. But my question, what was the discriminatory practice after the harasser was fired? It was two things. One, as your colleague said, it was permitting the hostile work environment to continue that is failing to stop it. And at some point, it became the firing of Neil DeMasters. Why don't we hear from Ms. Starr, and then we'll get you back on rebuttal. Yes, Your Honor. Thank you very much. Yes, pleasure. May it please the Court, my name is Susan Starr, and I represent the Equal Employment Opportunity Commission as amicus curiae. If I could just start with one point that Judge Krauss picked up on, the manager rule exception. I realize this is a Title VII case. But in the FLSA context, what is the EEOC's position with regard to whether the manager rule exception exists? Well, the commission does not enforce the FLSA. But the commission's position is that the manager's rule does not apply to Title VII because the FLSA does not have an opposition clause to it, and Title VII does. And a lot of the focus of the discussion has been on what's the definition of opposition. And Crawford, in the Supreme Court, made clear what that definition is. And it's simply the mere communication of underlying sexual harassment. The mere communication is enough. In that case, the Sixth Circuit had actually set out a rule. Let me back up. In Crawford, what happened was that they were investigating sexual harassment. A female employee was required to go and testify. So she testifies, and then she's fired for what she said. And so then the Sixth Circuit kicked the case, saying, well, that was not active, consistent opposition. You needed to do more. You didn't actively do it. You just were responsible. The Supreme Court said, no, that is enough. That all you have to do is, if you take no action, this is from the Supreme Court, if you take no action beyond disclosing underlying illegal behavior, you have engaged in oppositional behavior. And what page are you on? Oh, I'm sorry. I don't. I quoted it outside of the decision. OK, that's fine. I've got it here. So the commission's position is that a logical reading of Crawford and Burlington Northern and Ellerth, if you put all of those together, would require that employees should have an audit. Ellerth is you have a duty to investigate, which seems like that was done here. Absolutely, Your Honor. I think part of the argument is that the discrimination occurred during the investigation. And because it occurred during an employer's investigation, it was not, quote, under this subchapter. And the defendant is arguing that that should be very narrowly construed as an EEOC investigation as opposed to any investigation. And the commission was pointing out that under Ellerth and Farragher, employers are strongly encouraged to have these internal employment mechanisms, complaint mechanisms, and employees are strongly encouraged to take advantage of them. But hasn't every circuit that's addressed their action in the context of internal investigation rises to the level of participation rejected that? If we count Laughlin in the fourth, then isn't that eight circuits that have consistently rejected that position? Well, I would like to point out that Laughlin and some of these other decisions were decided prior to Ellerth and Farragher. So that kind of changed the landscape. How did it really change the landscape for participation? I mean, it set up an affirmative defense that employers can put these sorts of mechanisms in place and employees, if they unreasonably don't take advantage of them, may not be able to proceed. But it didn't require or make it part of Title VII's mandated mechanisms that there be an internal investigation. You bring up a good point, Your Honor. It didn't make it. It's not required for there to be an employer mechanism to state a cognizable claim. But in many circumstances, to state a cognizable claim for relief, you do have to take advantage of those circumstances. So if you couple that and then look at the plain language of Title VII, to read in this cramped way that investigations can only be EEOC investigations runs counter to some of the other provisions in Title VII. For example, Title VII provides for state and local fair employment practice agencies to investigate these very same claims. Under that kind of reading, one could retaliate for behavior occurring in those investigations and be outside the ambit of Title VII. Similarly, the Department of Justice prosecutes state and federal governments and does investigations pursuant to claims against state and federal governments. Those investigations would also be outside. So there's an inconsistency when Congress enacted Title VII and put together these provisions. It didn't mean just EEOC investigations. Well, we have to look at the case of University of Virginia versus Nassau, University of Texas versus Nassau, the 2013 decision of the Supreme Court. The court was very clear. We have to apply the text of the retaliation provision of Title VII strictly. We have to read it the way it's written, and we must interpret it properly and not expansively. Don't you run into trouble there with all the reaching out that you're doing beyond Title VII? I respectfully disagree. The language of the retaliation provision doesn't say EEOC investigations. It says investigations. Under the subjector. Under the subjector. And the Supreme Court has discussed what under the subjector for sexual harassment means. In other words, they weren't kind of rewriting Title VII. They were reading Title VII, and this was kind of the outcome of their reading of the text of Title VII. Are you talking about the opposition clause or the participation clause, or both? Both. What, if any, deference do we give to the EEOC's position in this litigation when the official and longstanding position of the EEOC in its compliance manual has been that reporting simply to an internal counselor is not sufficient for participation, except when one's talking about federal employees? Under Skidmore, don't we look at that lack of consistency? Again, Your Honor, that was written way before Ellerth and Farragher, and the commission has taken this position in other litigation. I mean, this is the official commission position, what was articulated in our brief, and that as a result of Farragher and Ellerth and the requirement of these internal mechanisms and that the Supreme Court made clear that when one is taking advantage of them, that this is something to be encouraged, that we want employers to have these mechanisms, we want employees to take advantage of these mechanisms. If you're going to fire somebody simply because, like in this case, he was furthering a complaint along the mechanism, one has to stand back kind of in a practical way. If one is allowed to fire an EAP officer who is merely advancing a complaint, why would the next EAP officer ever advance a complaint? They would deep-six it. There would be no incentive for them. There would be a huge disincentive, and then this is all happening in the workplace. It's not even happening at EEOC or at an external court proceeding. It's happening in the workplace. Word would get out, hey, if you bring a complaint to the EAP, forget it. They're just going to dump it, and there's nothing that we can do about it. If that person decides to advance it, they'll be fired, and the employer has a defense, and we're out of luck. But if merely advancing, that is, relaying the substance of a complaint, is enough to bring one within the at least opposition clause, then aren't we creating an entire category of employees who have that job to provide the sort of counseling to help facilitate or communicate complaints to the employer that all of those employees are effectively immune from any employment action? This is their job responsibility. Yeah, I have two responses. First of all, if they're negligent and they're performing their job, they could be fired for being negligent and performing their job. What if they don't meet timelines? What if they don't submit certain paperwork that the employer wants them to submit? They could be fired for that. They wouldn't be protected under Title VII. But if all they're doing, just because their job parallels what Title VII protects doesn't mean they're not entitled to the Title VII protection. So what's the logic there? They advanced somebody's sexual harassment complaint, and they're fired for advancing their sexual harassment complaint. If that's really the reason, shouldn't that be a violation of Title VII? I mean, it is retaliatory. Isn't that the first question we will be asking, Mr. Friedman? I don't . . . It may be. I have one final question. Judge Barry, do you have any other questions? I just have one final one before . . . I just have one question. On September 18, 2014, the Fourth Circuit en banc heard argument in a case called Boyer-Liberto. Now, no one here has brought that case to our official attention by means of a 20-J letter. Is it fair to assume, and perhaps I shouldn't be asking you the question so much as Mr. Grimes and Mr. Friedman, is it fair to assume that that case will . . . the outcome of the opinion that is pending in that case will not affect this case? I'm sorry, I can't respond to that. Okay. Thank you. Thank you. The question I have is, when you look at the compliance manual of the EEOC, it says that a complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination. What here was explicit or implicit that alleged during the course of these discussions between DeMasters and other people in HR, etc., or Mr. Baer, that alleges a practice that constitutes unlawful employment discrimination? Well, what we know is that DeMasters . . . Doe told DeMasters about this underlying sexual harassment. And then the person was fired within a short period of time thereafter. Okay. And then DeMasters went to HR . . . DeMasters got Doe's permission to file a complaint on his behalf. And then Doe took that . . . DeMasters took that complaint to HR. That is the implicit objection to the underlying sexual harassment. All right. Thank you. Thank you. Mr. Friedman? May it please the Court, I am Frank Friedman, representing the Carilion Defendants. Agnieszka Gabordy and Joshua Treese are with me at Council's table. All right. Thank you. Do you know what the status . . . Let's go to Judge Baer's question about the in-bank that was argued, I guess, on September 18th. Is that correct? Do you know anything about that and what the issues were? I have to say we did not read that. Okay. I don't know. Judge Baer, you want to just mention the issues that you understand were . . . One of the issues, I just came across this last night, but I suppose one could argue . . . The facts are different, but a broad reading of . . . A broad ruling in that case could have an effect on this Harroger-Farraga argument. One of the subjects for supplemental briefing, before the argument was heard, asked a question about . . . I will read. I have it here. What test should courts use to determine whether an employee's opposition to particular actions constitutes protected conduct, such that retaliation against the employee for her opposition would violate Title VII? That's why I brought the question up, because it could . . . A broad reading could answer or help answer that question. My just quick sketch answer to that would be, if it's dealing with Ellerth and Farrager, we just really think that Damascus is reaching to try to bring those in . . . To make this a claim that allows you to use an internal investigation that isn't affiliated with the EEOC or Title VII. As the courts already noted, I think we cited at least six, maybe seven circuits. It's unanimous. The best case that deals with that is Townsend, which says the EEOC is wrong. Why are we limited here to looking at internal investigations? We're not, but I think that's the way that the EEOC and Damascus are trying to use Ellerth. Would you agree that what we're ultimately looking at for Title VII discrimination is the intent of the employer? If an employer decides not to consider hiring someone because they assume from the name on a resume that that person is a female, it doesn't matter whether the person is really a male or female. They have based a decision on discrimination, right? Well, what we're looking at though is . . . Do you agree with me that we are looking with that example at the employer's intent? Well, again, the employer's intent has to be viewed in conjunction with protected activity. The question is, is there protected activity, which is what makes a Title VII case a Title VII case? The district court gave Mr. Damascus two opportunities to plead this. We're all, I think, in agreement that the case law supports the idea that assisting someone with the actual filing of an EEOC complaint or a federal lawsuit, that would squarely fall under the participation clause, right? Well, I think assisting someone with the actual lawsuit would probably be participation, but again, it depends. That's why they have the rules that they have. Title VII prohibits employers from retaliating against employees who engage in protected activity. But if what we're focusing on is the employer's discriminatory intent, and here the Carilion has documented that in statements and letters that include suggesting that the basis for his termination was that he had made statements that could reasonably have led Doe to conclude that he should file suit against Carilion, then why aren't we looking at this as just a traditional, not an internal investigation, but that this does relate, at least the motive in the termination, to the assistance and participation in a lawsuit? Well, and again, it doesn't relate for the simple reason that there are standards. Timing does matter, okay? And the truth is, despite the flowery descriptions, at every opportunity that Mr. DeMasters had a chance to actually or purposively raise opposition, he did not. When he had a chance— Well, he did say at the end of October, he says, you're not moving fast enough. Did he not? With regard to the continued—what Doe perceived to be a really tough, hostile environment subsequent to the firing of Doe's manager. Well, but you were exactly right, and I'll jump—I mean, I don't want to leave participation too fast, but we think that under this subsection is—subchapter is critical, and so does a lot of Fourth Circuit case law, and I'll try to come back to that. We can certainly come back to the participation clause, but on the opposition here, first of all, let's start off. Isn't the unlawful employment practice what the harasser did with regard to Doe? Yes. Okay, so that's the start. That's the start. And so he goes and he is advising this person, and he's going back and conferring with him, consulting with him, and then bringing back up the concerns that this person has. Ultimately, it results in the firing of Doe's manager. What was the master supposed to do? Because remember, what he was fired for in a letter is that he was not taking the pro-employer side and that he was not doing things in the best interest of the employer. What was not in the best interest of the employer? Okay. If we look at what the standard is, the three prongs, the Petrollo and the Laughlin standard for opposition, it's purpose of communication in opposition to discrimination. That's something unlawful at the time under the statute. And for the purpose of bringing the unlawful practice to the attention of the employer. Now, what they're doing, in 2008, when this occurs, he does nothing. Purposive, he relays, and then the problem under the statute is gone. You were exactly right when you were asking. And they conceded at JA73 that he was terminated. But my question to you, I'm working from the back end and coming toward the front now. He's fired over two years later. And he was told that he's fired because he didn't take the employer's side and he was not acting in the best interest of the employer. What was he doing that was not in the best interest of the employer? Well, in best light to the other side, I guess what they would say is that... I'm asking you, from your side, what was Mr. DeMaster's doing that was not in the best interest of the employer? I think that the letter that Mr. Derbyshire wrote says that he did not consider the ramifications of his... His what? Yeah. The question is, what specific interest of Carradine did Nick Masters fail to protect? It sounds to me, I don't see too much to the contrary, that his failure was that he was not pro-employer enough. Well, again... Correct? Correct? I think while the letter would suggest that, it is not... Again, Title VII requires purpose of conduct. He didn't do that in 2008. We're asking you the other side of the question. What did DeMasters do that was not pro-employer? In other words, if you're an employer, I would think you want to make sure you root out harassment. Of the kind that existed here. You want it gone. You don't want it from your workplace. It's toxic. And so he's helping to do that, and he's trying to make sure that they take care of the follow-up from that. And what is there that... What did he do that was not in the best interest of the employer? I can't say more than that anything he did was not a protected activity. I mean, obviously... So what's the EEAP... What is an EEAP consultant supposed to do? Just nothing? Well, no. That's exactly... Unless... No, no. If they do anything that is not pro-employer, they can be fired. So that, it seems to me, they can do what they can as long as it's not going to hurt the company. That is not so. In fact, the flip side of what they're arguing is actually worse for the workplace. Because what they're saying is, let's broaden this. Let's broaden it so far that you basically reward bystanders, somebody who just relays. The flip to that answer is, you look at it from the employee's point of view, is the consequences are that people are going to be afraid in the position of DEMASTERS to do anything to try to help another employee, period. Because they could get fired for it. Even if they didn't have it in DEMASTERS' case. I mean, just think what you're saying to the other... DEMASTERS doesn't have anything to do with the filing of the EEOC complaint by Doe. DEMASTERS doesn't even know that it was filed or that later on there was a suit filed and it was settled. Initially. So he goes two years without knowing anything. He gets fired. He gets fired. So, aren't the consequences this will send a very dangerous message to people in the position of DEMASTERS and employees. Hey, keep your mouth shut. Don't do anything. Well, no. It actually... What it would foster if just relaying is enough is it would actually encourage people not to say anything. It would encourage them not to rock the boat, which is exactly what DEMASTERS did. When he gets... He rocked the boat. Is that what he did that was not in the best interest of the employer? He did. He relayed the claim. Okay. I mean, again, I need to get to the elements because there's a statute and there are elements and the elements are purpose of communication of an unlawful act to the employer. He made... While there was a gender discrimination issue, while there was a harassment scenario, he didn't make purpose of communication. He just relayed. Then, within six days, that man is fired and all you have, as you all have referenced, is hurt feelings. They let the man back on to collect his belongings and I don't trust my supervisor... Understood. But then, over two years later, DEMASTERS is filed. This is DEMASTERS' case. So the thinking would normally be he must have opposed something else they wouldn't have said he wasn't protecting their interests. What was he opposing that was against their interests? I keep coming back to that and I'm not getting an answer. Well, at this stage, I guess what I have to say is he didn't oppose discrimination. I mean, I could tell you that there were other things. There's always two sides to a story and we're working off of this now. I can tell you... No, he did oppose the discrimination of the harasser of Doe. He relayed the harasser of Doe. He also expressed his opinion to Doe and walked Doe through the policy itself and then came up, as a leisurely complaint, with a plan to communicate that and facilitate an investigation. But that clearly isn't purpose of communication and it is the Moore case that says, and numerous other ones, if litigants claim to be retaliated against for having opposed discrimination, they must have stood in opposition to it, not just objectively report it. But then you've got, Mr. Grimes has noted, and it really comes from about three cases and I can even add a fourth, that an employee can oppose harassment short of actually lodging a complaint himself. You can do so that they include, one, quote, assisting another employee with his discrimination claim, close quote, or otherwise, quote, endeavoring to obtain the employer's compliance with Title VII. That's from the McDonald v. Cisneros case written by Judge Posner of the Seventh Circuit. Two, failing to prevent the filing of a discrimination claim. Three, expressing support of co-workers who have filed formal charges, or, and I will add a fourth, this is from a decision of Judge Weinfeld in the Southern District of New York, merely advising fellow employees of their rights under the law. That is deemed by courts to be opposing harassment, and that's short of actually DeMasters filing his own claim. It seems like that's a fairly low bar the courts have set up, and the EEOC as well. Well, some of that might be, the first one it sounded like assisting in the filing of the claim is participation, I would assume. And again, the Fourth Circuit is very clear. Judge Posner calls that an example of opposition. You have some cases, some cases that say if you file right on the edge, if you help a day or two ahead of time, that that's covered. But otherwise, I just don't think it is. Mr. Green, don't we have here a continuous course of conduct by DeMasters? We focused in on the activity before the harasser was terminated, but isn't it a fair inference from the complaint that in raising concerns about how the complaint was being handled, and having heard from Doe about this hostile environment, that DeMasters had a good faith, reasonable basis to be concerned about a retaliatory hostile work environment, a claim under Title VII, an unlawful employment practice  Are you saying, again, what we have to look at is when are we talking about? And if you're talking about 2011, you're turning a claim that wasn't a claim in 2008 into a claim three years later. No, this is the opposition that is arguably made by DeMasters in pointing out to Bayer that his opinion is that the complaint had not been handled properly. That's against the backdrop of what he's hearing about a hostile environment, hostility from coworkers that was allowed to manifest itself. Why isn't that, on his part, at least a good faith belief that there's been an unlawful employment practice in a retaliatory workplace? Well, as the court mentioned earlier, everything that occurred after the alleged harasser was fired, which was six days after the relay, that's really not a discriminatory environment. That's a legal conclusion on your part. Well, it's under Bass and the other cases we cite in our brief, just saying ongoing hostile environment is not sufficient, and that's all they do. They say ongoing hostile environment, but the truth is, as I think you alluded to earlier, the only things they allege, there are no facts to back that up, the only allegations that he has are the alleged harasser was allowed to collect his belongings and his friends were not getting along with me, and that's not a Title VII complaint. But at a motion to dismiss stage, we take the facts and all fair inferences in favor of the plaintiff, and since we're dealing here with a civil rights complaint, we are required to be especially solicitous and not dismiss that complaint unless it appears to a certainty that the plaintiff can't state a claim. Isn't there enough in the complaint, even after the termination, for DeMaster's oppositional statement to bear that he didn't think that the company was handling the complaint properly enough to warrant further discovery into whether he was terminated for that as well because he believed that there was a retaliatory hostile work environment? It's really not because, again, Title VII has elements, and that claim afterwards, I mean, there's not an unlawful, there's not a practice made unlawful by the act. There's hurt feelings. And this investigation, it's really important. There are like seven circuits all saying, you know, an investigation at that stage when nothing's going on, two years before the EEOC is filed, you know, not liking the investigation is not a Title VII claim unless... After the month of October, the contact between Doe and DeMaster's in October, the contact lasted approximately three weeks, the only other reference between that time and the time he was called in was one reference that at some point he complained to Carrion that the complaint was not being well handled. And when the Doe case settled in 2011, three weeks later, DeMaster's was fired. And the district court found that this was not a violation of Title VII retaliation law, but the district court also found, used words like the smell test and heavy-handed and, you know, pulled back a little from using the word bully. But when it came right down to it, there was no protected activity here. Would you agree, Mr. Friedman, that at least... Agree this much. When Carrion brought him in and fired him years after the events in question, it did not cover itself with glory, separate and apart from whether there is a viable Title VII retaliation claim. But what the case law says, glory or not, is that... Well, I'm asking you glory. You know, to the extent if you're asking me if it was Carrion, you know, if it was that man's best day, it probably wasn't. But not every single... And to be honest, there are a lot of other facts out there. There are plenty of good reasons why this occurred, but that's not for 12b-6. But bottom line, that still doesn't make it a Title VII claim, because not every hurt feeling in the workforce, not every action, not every unlawful action is a Title VII claim. And this was brought as a Title VII claim. There's no participation. And I think the court has shied away from that, but there clearly is no participation. The Thompson argument we've briefed extensively, and they're really stretching on that. But the opposition seems to be where we are, and there are three elements. And you need purposive communication. He never did any purposive communication. Dealing with a violation of the statute, which was over after six days from the first relay, to the employer. He never did that either until 2011. But I just gave you some examples where other courts have found that it's a very low bar for opposing a practice. But you're saying a moment ago, if we get beyond 12b-6, there are other reasons he could have been fired. But not one of those reasons was used in the meeting with him or in the termination letter. In effect, he was accused of being disloyal. And if I say to you, you are being disloyal to me, that means you must have done, logically, something in opposition to me that I did not like. Just at a common sense point of view, that seems to be what happened here. You've got a smoking gun. You've got what they put in a letter. I mean, maybe one could argue that there could be different interpretations or different statements that they claimed that they made during the meeting. But they put this in a letter. And there was a counsel present in the room when the meeting took place. I don't know if it was an inside counsel or outside. Do you? I'm not sure it's in the record. I think it was an inside. Inside counsel. So they had two officers, if you will, or two people responsible who could fire the masters and counsel. And then they afterwards draft a letter. And the letter says, you are fired because you were not acting in our best interests. I don't know how that survives or how you can dismiss that on 12B6, saying you don't have a claim at all. Doesn't that get us back to the fundamental issue we're dealing with in Title VII, and that is regardless of whether there was actually oppositional conduct or not, that the discrimination here, the alleged retaliation in the complaint, as documented with the statements in the letter, was the employer's belief that DeMaster had engaged in oppositional conduct and perhaps even participation in a lawsuit. And that is the reason that the adverse employment action was taken. Why isn't what's alleged enough to at least survive a motion to dismiss? Well, what you're saying in essence is perception theory because you're saying, I think, it doesn't fit within the parameters of the statute, but why can't we perceive that this is what Carillion was thinking? And, frankly, the Fourth Circuit hasn't recognized perception theory. Well, no, wait a minute. You perceive something based on their communication to you directly. I mean, it isn't like Gestalt theory or you're trying to put your own experiences onto someone else's. They're telling you, you are fired because you did not act in our best interests. In effect, you are disloyal. We're going round and round, and I don't... I'm sorry. I mean, we are going around, and yet the point remains. Even if you want to say, from an opposition standpoint, he is let go for not being supportive enough, among other things. The point is, there still has to be a Title VII claim involved. Well, the opposition, if you say opposition, the opposition would have started in October of 2008, correct? And that was, it got the ball rolling, so to speak. Now, we still don't know as a matter of record, and no one has told us when he filed the EEOC complaint, when Doe filed the EEOC complaint. It could have been right on top of the October 2008 events. We don't know. We do actually have an admission by the other side at JA61 and 64 that it was sometime in 2010. I'm not sure that that's correct, but they can see that below. That's as close as we can get. It's long after this October, long after, and it's really... But one can argue that the ball was already rolling. I think that if you want to look at October, which I also do, October 17th is the day that they met for the first time. He relays, which I think everyone agrees is not enough, just simple relay, and six days later, when Doe comes back, he's unhappy because the guy's already been gone, but he's unhappy he was let come back on for his belongings. So we know that the Title VII problem ended, the gender discrimination problem ended right about then, and there was never purposive communication, and it was not... And again, I do hearken back. They are saying that basically intermediaries should be encouraged to do that, just relay, and it's enough. If something blossoms, it's enough. And we think, really, that's wrong. What the court is suggesting is that you could have someone harassing employees and have that happen to five different employees, have the harasser fired promptly, and then for the next three years on evaluation day, people drop by HR and say, by the way, I opposed that harasser's conduct three years ago. It's a blueprint. It's just not right. You took the action that got this person fired and gave the reason that he was fired with regard to what happened pertaining to Doe. I mean, that's where we are right now. At this point, any further questions? If not, we'll take a bottle from Mr. Grimes. Thank you. Just a bit, and I will be brief. It's very hard to get a straight answer out of Corellian about why they fired the masters. But the smoking gun is the letter of January 16, 2012, from Mark Derbyshire, where he stated that he had determined that the plaintiff had made statements that could reasonably have led John Doe to conclude that he should file suit against Corellian. Now, look, Title VII's Anti-Retaliation Clause is supposed to encourage employees to come forward, but I ask you this question. If this decision stands, what person in their right mind would ever report harassment or discrimination at the risk of losing their job? My opponent, whether Freudian or otherwise, hit the nail on the head. He used the phrase, quote, he rocked the boat, close quote. And that's exactly why Neal DeMasters was fired. Judge Barry, I can address your question briefly about the case pending before the Fourth Circuit. I'll tell you what I know about it, and it's not a whole lot, but it is Borio-Liberto v. Fountain Blue Corporation, 752, F-30, 350. Their summary judgment was awarded to the employer on a hostile work environment, race, and retaliation claim. The holding of the panel was that the employee could not have had objectively reasonable belief that she was complaining about conduct, which was two related conversations that was unlawful under Title VII. There was a dissent by Chief Judge Traxler in that case with respect to the retaliation claim. As you pointed out, Judge Barry, the en banc argument was heard some time ago, and we're awaiting a decision. Whether that informs any of the issues in this case, only time will tell, but that's the status of the cases I know of. I thank you both for stepping out of your roles, as it were, to come down here, and the good news is we're in Maryland. The bad news is January, but nevertheless, we appreciate your taking the time. No, it's a pleasure being here, and I thank all counsel for well-presented arguments. I would ask counsel if you would get together with the clerk's office afterwards and have a transcript prepared of this oral argument and to split the costs evenly between Mr. DeMasters and Carillion. We'll leave the government out of this. And again, thank you. We'll come down and do the Fourth Circuit tradition, which is kind of nice. This item of court stands adjourned, signed and died. Godspeed to the United States.
judges: Thomas L. Ambro, Cheryl Ann Krause, Maryanne Trump Barry